A99A0263. ASIAN SQUARE PARTNERS, L.P. v. CUONG QUYNH LY.

(518 SE2d 166)

POPE, Presiding Judge.

On or around May 14, 1993, Cuong Quynh Ly d/b/a K & T Billiards entered into a five-year written commercial lease with Asian Square Partners, L.P. The lease is a pre-printed form furnished by Asian Square, to which the parties made handwritten and typewritten changes. Paragraph 4 (d) of the lease contains a five-year schedule of rent, which shows annual rental increases. Beneath the schedule is an asterisk referencing two footnotes at the bottom of the page. The first reads, "Tenant shall have a Five Year Option to lease." The second states, "Tenant shall start paying rent on July 15, 1993."

A rider to the lease granted K & T an option to renew for five additional years provided K & T gave Asian Square written notice 90 days prior to expiration of the original term. The renewal option stated, "The rental amount for each of the five (5) years shall be equal to a *N/A* percent *N/A* increase over the preceding year's rent." The term "N/A" in this provision was typed into two blanks on the pre-printed lease form.

K & T wrote a letter on March 21, 1998 notifying Asian Square that it intended to renew the lease for five additional years. On May 13, 1998, Asian Square replied that it would not renew the lease and that K & T had until June 15, 1998, to vacate the premises. When K & T did not vacate, Asian Square filed a dispossessory action. Following a brief hearing limited to the issue of the enforceability of the renewal option, the trial court found K & T had properly exercised its option to renew the lease and issued judgment in its favor. Asian Square appeals.

1. Asian Square first argues that the renewal option was unenforceable because it did not specify the rent to be paid during the renewal term.

> "A provision for the renewal of a lease must specify the terms and conditions of the renewal with such definite terms and certainty that the court may determine what has been agreed on, and if it falls short of this requirement it is not enforceable. It must be certain and definite both as to the time the lease is to extend and the rent to be paid."

(Footnote omitted.) *Smith v. Huckeba*, 232 Ga. App. 374, 375 (1) (501 SE2d 877) (1998). It is not necessary, however, that the renewal option specifically list these terms. It is sufficient if it provides a definite method for determining the amount of the rent and the duration of the renewal lease. The renewal provision is unenforceable only if these terms are not specified and no method is provided by which they can be determined. *Patellis v. 100 Galleria Parkway Assoc.*, 214 Ga. App. 154 (1) (447 SE2d 113) (1994).

In this instance, the renewal option specifically provides that the new lease shall be for five years, but states that the rent "shall be equal to a *N/A* percent *N/A* increase over the preceding year's rent." The parties disagree as to the meaning of this language. Asian Square argues the language shows that the parties did not decide what the rent would be during the renewal term. K & T argues the term "N/A" in the context of the language simply means that there will be no percentage increase in the rent during the renewal term.

> There are three steps in the process of contract construction. The trial court must first decide whether the contract language is ambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction (OCGA § 13-2-2); if after doing so the trial court determines that an ambiguity still remains, the trier of fact must then resolve the ambiguity.

(Citations and punctuation omitted.) *Empire Distrib. v. George L.*

*Smith II &c. Auth.*, 235 Ga. App. 742, 744 (509 SE2d 650) (1998). A court should only consider parol or other extrinsic evidence if any ambiguity remains after it has applied the rules of construction. Id.

We agree with the trial court's determination that the language of the renewal option is ambiguous, and that the applicable rules of construction must be employed to determine the parties' meaning. We also agree with the trial court that no ambiguity remains in the language after the rules of construction are applied.

At issue is what the parties meant by the term "N/A." In construing a contract, courts must give words their usual and common meaning. OCGA § 13-2-2 (2); *McDuffie v. Argroves*, 230 Ga. App. 723, 725 (2) (497 SE2d 5) (1998). In general usage, the term "N/A" is a shorthand form of the phrase "not applicable." Thus, the renewal option may be read as providing that the rent for the renewal term "shall be equal to a *not applicable* percent *not applicable* increase over the preceding year's rent."

The law favors a construction of this language that will uphold the contract as a whole, and "the whole contract should be looked to in arriving at the construction of any part." OCGA § 13-2-2 (4). Whenever the parties intended that a portion of the preprinted lease form was not to apply to their agreement, they drew a line through the language. However, they did not strike the language in the renewal option. Thus, it appears that the parties intended the renewal option to apply.

This conclusion is reinforced by a second rule of construction. Because the contract is printed, the typewritten portions of the contract prevail over the printed language. OCGA § 13-2-2 (7); *Grier v. Brogdon*, 234 Ga. App. 79, 81 (2) (505 SE2d 512) (1998). The lease contains a typewritten note in paragraph 4 stating that K & T was to have an option to renew, and the renewal option is intact, with the addition of the term "N/A" in the blanks specifying the percentage the rent would increase during the new lease.

When these rules are considered along with the rule that any ambiguity in the language must be construed against Asian Square as the drafter of the lease, OCGA § 13-2-2 (5); *McDuffie v. Argroves*, 230 Ga. App. at 725 (2); *Promenade Assoc. v. Finish Line*, 194 Ga. App. 741, 743 (391 SE2d 714) (1990), we find that the parties intended for the renewal option to apply, but did not intend for the language regarding a percentage increase in rent to apply. In other words, they intended that there would be no increase in rent for the renewal period.

And while the renewal option does not set out a specific amount for rent, it does provide a method for determining that amount. See *Patellis v. 100 Galleria Parkway Assoc.*, 214 Ga. App. at 154-155 (1). The lease defines the amount of rent that K & T would be paying at

the end of the original term, and the renewal option provides there will be no increase in that amount. Thus, the renewal option gave K & T the right to renew the lease for five years at the same rent it was paying at the end of the original term.

Because there is no uncertainty as to the duration of the new rental term or the amount of rent, the trial court correctly found that the renewal option was enforceable. Compare *Smith v. Huckeba*, 232 Ga. App. at 376 (where lease gave no method for determining the rent for the renewal term, but stated only that it would be the "fair market rental value of the property" at the time of renewal); *Patellis v. 100 Galleria Parkway Assoc.*, 214 Ga. App. at 155 (where lease provided that rental rate for the renewal would be negotiated between landlord and tenant at the time of renewal).

2. Asian Square next contends the trial court erred in ruling that K & T had properly exercised its option to renew without hearing additional evidence on the issue. We agree and reverse.

Under the renewal provision, K & T was required to give Asian Square notice of its intent to renew 90 days before the expiration of the original term. The second paragraph of the lease provides,

> The term of this Lease (hereinafter referred to as the "Lease Term") shall commence on the "Rental Commencement Date" hereinafter described and, unless sooner terminated or extended as hereinafter provided, shall terminate on the last day of the ___ Lease Year (as that term is hereinafter defined).

Under this provision, the original term ended on the last day of a designated lease year. While the parties failed to specify which lease year marked the end of the term, other provisions in the lease appear to anticipate a five-year term. The rental schedule in paragraph 4 (d) clearly contemplates a lease extending for five years, and the renewal option provides the opportunity to extend the lease for "an additional five (5) years." Viewing the contract as a whole, therefore, we conclude that the parties intended the original term to end on the last day of the fifth lease year. OCGA § 13-2-2 (4).

The lease then describes "lease year" as "the first full twelve (12) calendar month period contained within the Lease Term and each successive twelve (12) calendar month period thereafter, and the first lease year shall also include any partial calendar month at the beginning of the Lease Term." Therefore, a lease year is defined as the first 12-month period after the lease term begins, as well as any subsequent 12-month periods within the term. Paragraph 2 provides that the lease term begins on the "Rental Commencement Date," and thus each lease year runs for a 12-month period after the Rental Com-

mencement Date.

The crucial question then is what the parties intended by the term "Rental Commencement Date." The trial court found that the Rental Commencement Date was July 15, 1993, based upon the type-written footnote to paragraph 4 (d) stating that the tenant was to start paying rent on that date. However, the term "Rental Commencement Date" is a defined term, which has no direct connection to the date rent is first paid.

Paragraph 3 of the lease states,

> The term Rental Commencement Date shall mean the earlier to occur of the date *FIVE* (5) days after Landlord shall notify Tenant that the Demised Premises are ready for occupancy, or the date on which the Tenant shall be deemed to have accepted the Demised Premises, to have acknowledged that the same are in the condition called for hereunder, and to have agreed that as of the time all of the obligations of the Landlord imposed under this Lease have been fully performed.

The lease then states that the parties are to execute a written instrument specifying and acknowledging the Rental Commencement Date and the expiration of the Lease Term. No such written instrument appears in the record.

As the parties failed to specify a date, the Rental Commencement Date must be determined from the definition in the lease. That definition is dependent upon extrinsic facts regarding Asian Square's notice and K & T's acceptance of the premises. Therefore, the trier of fact will require additional evidence before determining the Rental Commencement Date.

Accordingly, we find that it was error for judgment to issue in favor of K & T without the consideration of additional evidence. We therefore remand for further proceedings in accordance with this decision.

*Judgment affirmed in part and reversed and remanded in part. Smith and Eldridge, JJ., concur.*

DECIDED MAY 19, 1999.

*Charles F. Peebles*, for appellant.
*Paul S. Suda, Max Benkel*, for appellee.